**RIKER DANZIG LLP**
Joseph L. Schwartz (JS-5525)
Tod S. Chasin (TC-0122)
Daniel A. Bloom (DB-6392)
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey  07962-1981
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
jschwartz@riker.com
tchasin@riker.com
dbloom@riker.com

*Attorneys for Plaintiff, National Realty Investment Advisors, LLC*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT<br>ADVISORS, LLC, *et al.* [1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 22-14539 (JKS)<br><br>(Jointly Administered) |
| In re:<br><br>NATIONAL REALTY INVESTMENT<br>ADVISORS, LLC,<br><br>              Plaintiff,<br>v.<br><br>THOMAS "NICK" SALZANO, ARTHUR<br>RAYMOND SCUTARO, and ARTHUR<br>RAYMOND SCUTARO, JR.,<br><br>              Defendants. | Adv. Pro. No. 22-01233-JKS |

## PLAINTIFF'S OBJECTION TO ARTHUR RAYMOND SCUTARO, JR.'S MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) AND FED. R. BANKR. P. 7012(b)(6)

Plaintiff, National Realty Investment Advisors, LLC ("NRIA"), one of the Debtors herein

(together with its debtor affiliates, the "Debtors"), by and through its counsel, Riker Danzig LLP,

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA. The location of the Debtors' service address is: 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094.

submits this Objection to the motion filed by defendant Arthur Raymond (a.k.a. "AJ") Scutaro

("AJ")[2], to dismiss NRIA's Amended Complaint[3] (as defined below) pursuant to Fed. R. Civ. P.

12(b)(6) and Fed. R. Bankr. P. 7012(b)(6) [Adv. Pro. Docket No. 15] (the "Motion to Dismiss").

In support of this Objection, NRIA respectfully represents as follows:

## PRELIMINARY STATEMENT

After being victimized by the fraud and deceit of AJ and various of his cohorts prior to

the Debtors' bankruptcy filings, which individuals include co-defendants Thomas "Nick"

Salzano ("Salzano") and Arthur Raymond Scutaro ("Arthur Scutaro" and, collectively with AJ

and Salzano, the "Defendants"), AJ now brings a meritless motion to dismiss, based solely on his

contention that he supposedly never retained any portion of the $600,000 in cash that he admits

that he improperly accepted and received from one of NRIA's investors.

Through his motion, AJ attempts to raise speculative "facts" on a motion to dismiss,

which is entirely improper as a matter of law.  More fundamentally, AJ maintains that he did

nothing wrong, that any wrongdoing was done by Salzano alone, and that the Amended

Complaint is therefore frivolous.  However, if the facts alleged in the Amended Complaint are

accepted as true, as they must be for purposes of this Motion to Dismiss, those facts support

NRIA's claims and state claims against AJ for the relief sought in the Amended Complaint.

Further, notwithstanding AJ's obvious participation in a fraudulent scheme (assuming the

facts alleged in the Amended Complaint are accepted as true), in his quest to summarily dismiss

all of NRIA's causes of action, in his Motion to Dismiss, curiously, AJ alleges that the simple

existence of the Amended Complaint is purportedly damaging AJ's reputation and is also

---

[2] Based on NRIA's investigation, alternate spellings of AJ's surname appear to include "Scuttaro" and
"Scutaro," both with and without the suffix "Jr."

[3] The Motion to Dismiss was filed in response to NRIA's initial Complaint.  NRIA subsequently filed the
Amended Complaint wherein NRIA removed one cause of action.  This Objection treats the Motion to
Dismiss as seeking dismissal of the Amended Complaint.

purportedly impeding his ability to obtain suitable employment.  AJ's protestations of innocence

notwithstanding, NRIA's filing of the Amended Complaint was but the first of many legal

troubles for AJ.  For example, on January 5, 2023, various investors in NRIA instituted a class

action lawsuit in the United States District Court for the District of New Jersey against AJ and

other of AJ's former NRIA cohorts, alleging very serious violations of federal and state

securities laws.  A copy of the complaint commencing that lawsuit is annexed hereto as <u>Exhibit</u>

<u>A</u>.  In that class action complaint, plaintiffs allege, among other things, that:

- AJ actively engaged in concealment, trickery and fraud in withholding and concealing information to NRIA investors. <u>See</u> Exhibit A, ¶¶ 58-60.

- AJ, through his position with NRIA, made a series of material misrepresentations and omissions in the offer and sale of membership units in the NRIA Fund. <u>See</u> Exhibit A, ¶¶ 61-62.

- AJ used investors' contributions to cover distributions being paid out to previous investors as part of an illegal Ponzi scheme. <u>See</u> Exhibit A, ¶¶ 63-66.

- AJ used "straw investors" to defraud investors. <u>See</u> Exhibit A, ¶¶ 78-84.

- AJ diverted investors' funds into his own personal accounts and into accounts owned by other NRIA fraudsters. <u>See</u> Exhibit A, ¶¶ 85-90.

- AJ failed to represent to investors that investor funds were being invested in speculative commercial mortgage-backed securities. <u>See</u> Exhibit A, ¶¶ 91-98.

- AJ was part of the improper employment of unlicensed salespersons at NRIA. <u>See</u> Exhibit A, ¶¶ 99-103.

- AJ breached state and federal securities laws. <u>See</u> Exhibit A, ¶¶ 118-154.

- AJ engaged in common law fraud and negligent misrepresentations. <u>See</u> Exhibit A, ¶¶ 155-160.

- AJ was unjustly enriched. <u>See</u> Exhibit A ¶¶ 161-167.

While the investors' class action lawsuit is certainly a separate action, the allegations at

issue therein underscore the importance of allowing this adversary proceeding to develop

through and beyond the discovery phase.  AJ should not be allowed to obfuscate this situation, completely avoid discovery and summarily walk away from his wrongdoing based on his sole irrelevant (and unproven) assertion that he purportedly did not retain some or all of the cash that he unquestionably and admittedly improperly received.

For these reasons and those set forth below, NRIA respectfully requests that the Court deny the Motion to Dismiss.

## PROCEDURAL BACKGROUND

### A.     The Debtors' Chapter 11 Petitions for Relief

1.     On June 7, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of New Jersey (the "Court").  Prior to the Petition Date, the Debtors' operations included real estate development, as well as selling membership interests in the NRIA Partners Portfolio Fund I LLC (the "Fund") to numerous investors.

2.     Prior to the Petition Date, AJ was an employee of certain of the Debtors, and was Assistant Senior Vice President of the Fund.  AJ was involved in a number of fraudulent schemes with Salzano, with Arthur Scutaro (AJ's father) and with various other of the Debtors' fraudster cohorts, including the fraudulent scheme referenced in the Amended Complaint.  On or about May 25, 2022, or approximately two weeks before the Petition Date, NRIA terminated AJ's employment with the Debtors.

### B.     The Adversary Proceeding

3.     Shortly after the Petition Date, on July 18, 2022, NRIA filed its original Complaint (the "Original Complaint") with the Court, commencing this adversary proceeding (the "Adversary Proceeding").

4.      On December 2, 2022, NRIA filed its Amended Complaint with the Court [Adv. Pro. Docket No. 18] (the "Amended Complaint") against all the Defendants in the Adversary Proceeding.[4]

5.      By its Amended Complaint, NRIA alleges, *inter alia,* that AJ admitted that he had accepted and received the sum of $600,000.00 in cash from "Investor C" (the "Cash"), which AJ never caused to be deposited in any bank account belonging to NRIA or the Fund. See Adv. Pro. Docket No. 18, ¶ 34.  NRIA further alleges that AJ admitted that he had conferred with Salzano, admitted receiving the Cash from Investor C between August and November 2020, and admitted giving the cash to Salzano, all in violation of NRIA's policy prohibiting its personnel from accepting cash for any investment in the Fund.  Id., ¶¶ 33-36, 44.  NRIA further alleges that in connection with his acceptance of the Cash, AJ caused an agreement to be executed describing Investor C's investment but failed to provide in that written agreement that AJ had received and accepted the Cash from Investor C.  Id., ¶ 37.  NRIA also alleges that neither AJ nor Salzano completed any paperwork at NRIA documenting the receipt of the Cash.  Id., ¶ 39.  NRIA also alleges that, upon information and belief based on these admissions by AJ, AJ and/or Salzano misappropriated and took the Cash for their own benefit.  Id., ¶ 42.

6.      As described further below, as a result of AJ's misappropriation of the Cash, through the Adversary Proceeding, NRIA asserts a number of causes of action against AJ, including, but not limited to, seeking to avoid and recover the transferred Cash from AJ as a fraudulent transfer, as well as seeking turnover of the Cash, and damages for conversion, breach of fiduciary duty, breach of duty of loyalty, fraudulent misrepresentation and concealment.

---

[4] The Amended Complaint is essentially the same as the Original Complaint except that Count X of the Original Complaint was removed.

C.      **AJ's Motion to Dismiss**

7.      On November 21, 2022, AJ filed the Motion to Dismiss.  In the Motion to Dismiss, while readily admitting that he accepted and received the Cash from Investor C, AJ now alleges that he purportedly did not retain some or all of the Cash that he gave to Salzano. As AJ would have it, this purportedly renders NRIA's allegations against him in the Amended Complaint as "speculative."

## FACTUAL BACKGROUND

I.      **The Defendants' Scheme**

8.      As is alleged in the Amended Complaint, the Defendants, all former NRIA employees, illegally transferred, converted, and misappropriated from NRIA cash sums totaling $1,030,000.00 between February and November 2020.  At all times, the Defendants were aware that accepting cash from individual investors violated NRIA's internal policy prohibiting its personnel from accepting cash for any investment in the Fund.  Nevertheless, the Defendants improperly accepted cash from at least three investors.  See Amended Cmpl., ¶ 1.

9.      The improper transfers of the cash to the Defendants were discovered by Brian J. Casey, the Debtors' former Independent Manager.  See Amended Cmpl., ¶ 2.

II.     **AJ's Misappropriation of Investor C's Cash Investment in the Fund**

10.     As is alleged in the Amended Complaint, between approximately August and November 2020, an individual ("Investor C") contacted AJ multiple times to request that Investor C be permitted to make an investment in the Fund in cash.  AJ initially declined Investor C's request.  See Amended Cmpl., ¶ 32.

11.     Despite having initially declined Investor C's request to invest cash in the Fund, AJ nonetheless later conspired with Salzano with respect to Investor C's request.  Those subsequent discussions between AJ and Salzano resulted in an agreement between AJ and

Salzano to accept the Cash from Investor C. AJ thereafter contacted Investor C to advise that AJ would accept Investor C's cash investment. <u>See</u> Amended Cmpl., ¶ 33.

12.    As a result, between approximately August and November 2020, AJ accepted the Cash ($600,000) from Investor C, which AJ admits. Investor C also provided AJ with a check in the amount of $150,000.00 as part of a total investment of $750,000 in the Fund. As part of his scheme with Salzano, AJ instructed Investor C to date the $150,000 check as of mid-January 2021. <u>See</u> Amended Cmpl., ¶¶ 34, 44.

13.    AJ accepted the Cash from Investor C despite having full and complete knowledge that it was in violation of NRIA's internal policy prohibiting its personnel from accepting cash for any investment in the Fund. <u>See</u> Amended Cmpl.,¶ 35.

14.    Shortly after accepting and receiving the Cash from Investor C, AJ gave the Cash to Salzano, which AJ admits. <u>See</u> Amended Cmpl., ¶¶ 36, 44.

15.    In connection with accepting and receiving the $600,000 in Cash and the $150,000 by check, AJ prepared and had executed, or instructed one or more other employees of NRIA to prepare and have executed, a "Discount Investment & Sign Up Agreement" (the "<u>Investor C Agreement</u>"). The Investor C Agreement described a transaction whereby Investor C provided an investment of $150,000 and was given a $600,000 discount on the purchase of 0.75 $1,000,000 units of the Fund's Preferred Series A-1 Non-Voting Membership Interests. The Investor C Agreement described the discount as being for "purchase of a sales lead list of personal referrals the Investor will provide [the Fund] of other potential investor purchasing customers investor will personally refer to [the Fund] – with no guarantee said leads will in fact invest with [the Fund]." Attached to the Investor C Agreement was a list of approximately twenty-five (25) names with telephone numbers under the heading "Referral to NRIA." Investor C received an interest in the Fund worth $750,000. <u>See</u> Amended Cmpl., ¶ 37.

16.    Despite obviously knowing that he received and accepted the Cash from
Investor C, AJ failed to include, reference or even mention the $600,000 in Cash in the Investor
C Agreement.  See Amended Cmpl.,¶ 38.

17.    Additionally, AJ improperly failed to complete any internal paperwork at
NRIA documenting the receipt of $600,000 in Cash that AJ had received and accepted from
Investor C.  See Amended Complaint ¶ 39.

18.    Further, AJ improperly failed to complete or file any report with any
governmental agency concerning his acceptance and receipt of the $600,000 in Cash on behalf of
the Fund from Investor C.  See Amended Cmpl., ¶ 40.

19.    AJ also failed to cause the $600,000 in Cash that he accepted and received
from Investor C to be deposited in any bank account belonging to NRIA or the Fund.  See
Amended Cmpl.,¶ 41.

20.    In view of the foregoing, NRIA alleges upon information and belief, and
based on these admissions by AJ, that AJ and/or Salzano improperly misappropriated the Cash
for their own benefit.  See Amended Cmpl.,  ¶¶ 42, 44.

21.    In response to these well-pleaded allegations, AJ now seeks to summarily
dismiss the Amended Complaint as against AJ before an answer is even filed, based on the claim
that he did not retain some or all of the Cash and instead gave it to Salzano, which purportedly
renders NRIA's allegations as against him to be speculative.[5]  The Motion to Dismiss lacks merit
and must be denied.

---

[5] AJ also suggests in the Motion to Dismiss that the Amended Complaint is "frivolous," and that the
simple existence of the Amended Complaint is purportedly damaging AJ's reputation and is also
supposedly impeding AJ's ability to obtain suitable employment.  NRIA urges the Court to ignore AJ's
rhetoric and hyperbole.

**<u>OBJECTION</u>**

**I.     APPLICABLE LEGAL STANDARD.**

22.     AJ brings the Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), applicable herein through Fed. R. Bankr. P. 7012.

23.     On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court should assess the legal feasibility of the complaint, and is required to accept as true all factual assertions made in the complaint.  See <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 231 (3d Cir. 2008); <u>Evancho v. Fisher</u>, 423 F.3d 347, 351 (3d Cir. 2005).

24.     A court should grant such a motion to dismiss only if, after viewing plaintiff's arguments in the most favorable light, the court determines that the plaintiff has not pled "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 128 S. Ct. 1937, 1949 (2009).

25.     The burden falls on the moving party to demonstrate that no claim for which any relief can be granted has been presented. See <u>Hedges v. U.S.</u>, 404 F.3d 744, 750 (3d Cir. 2005).

26.     Thus, while a complaint must provide the grounds for the relief sought, the complaint <u>need</u> <u>not</u> provide detailed factual allegations. See <u>Twombly</u>, 128 S. Ct. at 1964. Although a plaintiff is required to provide more than "a formulaic recitation of the elements of a cause of action," the "[f]actual allegations must . . . raise a right to relief above the speculative level." <u>Twombly</u>, 127 S. Ct. at 1965.

27.     Interpreting <u>Twombly</u>, the Third Circuit has explained:

The Supreme Court's <u>Twombly</u> formulation of the pleading standard can be summed up thus: stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough

facts to raise a reasonable expectation that discovery will reveal evidence of the
necessary element.

Phillips, 515 F.3d at 234 (internal quotations and citations omitted); see also Stanziale v.

Dalmiau, 379 B.R. 69, 76 (Bankr. D.N.J. 2007) (internal quotations omitted) ("A complaint does

not have to plead evidence, and a plaintiff in no way risks dismissal (let alone defeat at trial)

because his complaint does not set forth a complete and convincing picture of the alleged

wrongdoing. . . . Specific details underlying a complaint can wait for later stages, such as

discovery or summary judgment motions.").

28.    Throughout the Motion to Dismiss, AJ consistently attempts to impose his

misguided view that NRIA must prove its entire case during this early pleading stage.  As well-

established law makes clear, however, this is simply incorrect as a matter of law.  For this

reason, and for the reasons set forth below, the Motion should be denied.

## II.    AJ'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE EACH COUNT OF THE AMENDED COMPLAINT ADEQUATELY PLEADS A CLAIM FOR RELIEF.

### A.    AJ Misapplies the Applicable Legal Standard

29.    The Motion to Dismiss is flawed because, among other reasons, it

misapplies the relevant legal standard for a motion to dismiss.  AJ attempts to cloud the analysis

of this straightforward issue by attacking the substance of NRIA's Amended Complaint – the

factual allegations that must, for the purposes of a motion to dismiss, be accepted as true.

Contrary to AJ's assertions, however, NRIA is not required to prove its entire case at this stage.

Instead, NRIA need only plead enough facts to state a claim for relief that is plausible on its face,

and, in the case of allegations of fraud, do so with sufficient particularity to survive the

heightened pleading standard required for that claim.  NRIA submits that it has more than

sufficiently satisfied these requirements in connection with each count of the Amended

Complaint.  Accordingly, NRIA submits that the Court should reject AJ's flawed substantive arguments and deny the Motion to Dismiss.

      **B.**     **NRIA Has Pled Fraud with Particularity**

      30.   Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . be stated with particularity," however "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).  "Rule 9(b) requires plaintiff to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendant on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Marc. Corp., 742 F.2d 786, 791 (3d Cir. 1984).

      31.   Courts in this district have recognized that the requirement to plead fraud with particularity is relaxed when the facts and circumstances of the fraudulent conduct are specifically within the personal knowledge of a corporation's principals. See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992) (quoting Christidis v. First Pa. Mortgage Trust, 717 F.2d 96, 99-100 (3d Cir. 1983) ("courts should be 'sensitive' to the fact that the application of the Rule prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud"); In re Halpert & Co., Inc., 254 B.R. 104, 127 (Bankr. D.N.J. 1999) (same); Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989) ("Particularly [in] cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. . . . Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control.").

      32.   Moreover, in circumstances where the details of the fraud are particularly within the knowledge of those committing the fraud, a party may plead "upon information and

belief." See Azurite Corp. Ltd. v. Amster & Co., 730 F.Supp. 571, 576 (S.D.N.Y. 1990); see

also In re Campbell Soup Co. Securities Litigation, 145 F.Supp.2d 574, 585 (D.N.J. 2001).  This

type of pleading is permissible so long as the plaintiff sets forth the factual basis for his or her

belief.  See Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989); U.S.

ex rel Foster v. Bristol Meyers Squibb Co., 587 F.Supp.2d 805, 820 (E.D. Tex. 2008).

      33.    The Amended Complaint exceedingly satisfies the heightened pleading

requirements of Rule 9(b), particularly in light of the fact that most of the details regarding AJ's

(and his co-Defendants') fraud are particularly within the knowledge of AJ and/or his co-

Defendants.  Courts have held that to satisfy the particularity standard, the plaintiff must plead

the "who, what, where, when and how" of the fraud. See In re Rockefeller Center Properties, Inc.

Securities Litigation, 311 F.3d 198, 217 (3d Cir. 2002); see also In re Novergence, Inc., 405 B.R.

709, 726 (Bankr. D.N.J. 2009) ("Generally, fraud allegations of date, place and exact manner

qualify for purposes of meeting the R. 9 standard . . .  A plaintiff is free, however, to utilize

'alternative means of injecting precision and some measure of substantiation into a fraud

allegation.'") (internal citations omitted).  So long as a complaint "provides defendant with [a]

reasonable opportunity to frame [a] response," a "general averment . . . will satisfy [the]

procedural rule requiring fraud claims to be pled with particularity." See Union Carbide Corp. v.

Montell N.V., 944 F. Supp. 1119 (S.D.N.Y. 1996); see also In re Barr, 188 B.R. 565, 570

(Bankr. N.D. Ill. 1995) ("When alleging fraud in a complaint, it is only necessary to set forth the

basic outline of fraud and to indicate who made the misrepresentations and the time and place the

misrepresentations were made.").

      34.    Here, NRIA has pled the "who, what, where, when and how" of the fraud in

as much detail as it could reasonably acquire without the benefit of discovery.  The Amended

Complaint specifically identifies AJ as one of the perpetrators of the alleged fraud and of the

misconduct.  The Amended Complaint also provides details about his admitted acts of fraud, misrepresentation, conversion, self-dealing, failure to comply with corporate policy, and misappropriation of the Cash at issue.  The Amended Complaint avers that, to the best of NRIA's knowledge, much of this activity between August and November of 2020 and  took place within the applicable statutory periods at issue.  Additionally, the Amended Complaint alleges the manner in which AJ went about defrauding NRIA, particularly through his admitted inappropriate receipt of the Cash.  As a result, NRIA submits that there are more than enough facts pled in the Amended Complaint to give AJ "a reasonable opportunity to frame a response." See Barr, 188 B.R. at 570.

35.    Ultimately, however, at this stage of the Adversary Proceeding, the true extent of the fraud and other alleged misconduct is known only to AJ and his co-Defendants. Through discovery, of course, NRIA desires to shed light on all of the Defendants' fraud and other misconduct.  Accordingly, to the extent that any of NRIA's allegations could be considered "general averments," they are nevertheless permissible even under Rule 9(b)'s heightened pleading requirements pursuant to the extensive body of case law discussed above.

   **C.    NRIA's Allegations that Salzano and/or AJ Took and Misappropriated Cash are Entitled to the Assumption of Truth**

36.    AJ does not now deny that he received and accepted the Cash, which he has previously admitted, and which the Amended Complaint expressly alleges (in violation of NRIA's internal policies), yet contends that NRIA's allegation that Salzano and/or AJ retained the Cash for their own benefit is not entitled to the assumption of truth because the allegation is based on NRIA's information and belief, as well as because of NRIA's use of "and/or" as an alternative claim.

37.    First, NRIA's use of the words "and/or" in the Amended Complaint was certainly proper in that the words were not intended to allege that only one of either Salzano *or*

AJ received the fraudulently-transferred and misappropriated Cash. Rather, the phrase "and/or" was simply used to allege that both of these Defendants were involved in the improper receipt, transfer and misappropriation of fraudulently-transferred Cash – albeit in different capacities. Specifically, as discussed further herein, AJ was the *initial* transferee of the Cash, while Salzano was the *mediate* transferee of the Cash. Each played their role in perpetrating the fraud and misappropriation of the Cash that Investor C paid to NRIA.

38.    As discussed above, without discovery, the particular details of AJ's misconduct are known only to AJ and his co-Defendants. Certainly, NRIA alleges that AJ admitted to receiving and accepting the Cash from Investor C. <u>See</u> Amended Cmpl., ¶¶ 35, 44. Thus, NRIA has sufficiently satisfied the standards of <u>Twombly</u>, as the Amended Complaint alleges facts that raise a right to relief above the speculative level.

### D.    <u>Whether AJ Received Any Cash Following the Initial Transfer is Irrelevant</u>

39.    AJ's Motion to Dismiss largely rests on his argument – repeated many times in his Motion to Dismiss – that no fraudulent transfer was properly alleged because no reasonable inference can be made that AJ retained or received any of the Cash from Salzano, or otherwise benefited from the alleged transfer. However, the absence of such an allegation in the Amended Complaint is irrelevant, and NRIA submits that this argument is a red herring. Indeed, AJ's deliberate acceptance and receipt of the Cash, in defiance of NRIA's written policy barring such transactions, and AJ's ensuing failures to (i) include, reference or even mention the Cash in the Investor C Agreement, (ii) complete any internal paperwork at NRIA documenting his receipt of the Cash, (iii) complete or file any report with any governmental agency concerning his receipt of the Cash and (iv) cause the Cash to be deposited into an NRIA account, all of which is alleged in the Amended Complaint, constituted the *de facto* transfer of the Cash to AJ in

his personal capacity as an initial transferee pursuant to Section 550(a)(1) of Bankruptcy Code.

Section 550(a)(1) of Bankruptcy Code states:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
>> (1) the *initial transferee of such transfer* or the entity for whose benefit such transfer was made; or
>>
>> (2) any immediate or mediate transferee of such initial transferee.

Id. (emphasis added).

40.   Notably, Section 550(a)(1) uses the alternative language "or the entity for whose benefit such transfer was made" to indicate that an initial transferee *need not* derive any benefit from the initial transfer to so qualify. Sklar v. Susquehanna Bank (In re Glob. Prot. USA, Inc.), 546 B.R. 586, 624 (Bankr. D.N.J. 2016) ("The implication [of the alternative language] is that the entity for whose benefit the transfer was made is different from a transferee, immediate or otherwise."). Further, unlike in the case of a mediate transferee, there is no "good faith" defense available to an initial transferee. Id. at 620 ("[I]t is important to determine whether the entity from which a plaintiff seeks to recover is an initial transferee or an entity for whose benefit such transfer was made, versus an immediate or mediate transferee, as only the latter may assert the section 550(b) [good faith] defense.").

41.   AJ qualifies as an initial transferee according to the prevailing test employed by courts within the Third Circuit. See Sklar v. Susquehanna Bank (In re Glob. Prot. USA, Inc.), 546 B.R. 586, 622 (Bankr. D.N.J. 2016) (collecting cases). Under the "dominion and control" test, an initial transferee is one who receives funds and is "capable of using the funds for whatever purposes he or she wishes, be it to invest in lottery tickets or uranium stocks."

Official Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.), 287

B.R. 41, 46 (Bankr. D.N.J. 2002) (internal quotation marks omitted).

42.    As alleged in the Amended Complaint at ¶ 1, AJ violated NRIA corporate

policy by accepting the Cash from Investor C, manifestly on behalf of NRIA, but in reality on

behalf of himself as initial transferee, before in turn transferring the Cash to Salzano as mediate

transferee pursuant to Section 550(a)(2) of the Bankruptcy Code.[6]

43.    As set forth above, whether AJ retained any of the Cash, whether Salzano

gave AJ any or all of the Cash, or whether AJ benefitted from the Cash, are entirely irrelevant.

As an initial transferee pursuant to Section 550(a)(1) of Bankruptcy Code, AJ received the Cash

in violation of NRIA corporate policy and in his personal capacity.    He then chose to

misappropriate the Cash, again in contravention of NRIA corporate policy, by transferring it to

Salzano as the mediate transferee.

44.    Accordingly, AJ's arguments regarding the sufficiency of NRIA's

allegations in Counts I, II, III, and IV are inapposite – each count alleges facts sufficient to raise

---

[6] Any argument that AJ served as a "mere conduit" is both unfounded and, in any event, cannot properly
be raised on a motion to dismiss. See In re Allen, No. 13-14348(GMB), 2014 Bankr. LEXIS 1302, at *38
(Bankr. D.N.J. Mar. 26, 2014) ("To be a mere conduit, a defendant has to establish that it lacked
dominion or control over the transfer, and that it just passed through its hands and it had no power to
redirect the funds to its own use.").  Cases in which courts have determined a potential initial transferee to
be a "mere conduit" typically involve funds received by ministerial custodians, such as banking
institutions, which receive funds for deposit, attorneys who receive funds transferred to attorney escrow
accounts, insurance brokers passing premiums to an insurer, and the like. See Bonded Fin. Servs. v.
European Am. Bank, 838 F.2d 890, 894 (7th Cir. 1988) (finding that a bank which received a check for
one of its account holders with the instruction to "deposit into account" was not an initial transferee, as it
acted as a financial intermediary); In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson &
Casey, 130 F.3d 52, 57 (2d Cir. 1997) (finding that an insurance broker was a mere conduit as to
premiums transferred from debtor to insurer); Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho,
Inc.), 33 B.R. 334 (Bankr. S.D.N.Y. 1983) (a law firm maintaining an escrow account for a transferee
acted as a mere conduit and, therefore, was not the initial transferee).  In contrast here, AJ could not have
been a "mere conduit" serving in a similarly-clerical capacity on behalf of NRIA, because the transfer he
effectuated *was unauthorized* and *was a violation* of NRIA policy, and because AJ exercised dominion
and control over the Cash by converting it to his benefit or for Salzano's benefit.  See Amended Cmpl., ¶
1, Count VI (conversion).

a reasonable expectation that discovery will reveal evidence of the necessary elements of each claim.

      **E.**    **AJ's Conclusory Statements that NRIA Fails to State Plausible Claims Against Him Cannot Satisfy His Burden**

      45.    AJ also contends that Count IX of the Amended Complaint fails to state a claim for fraudulent misrepresentation and concealment because AJ belatedly disclosed to NRIA his acceptance and receipt of the Cash and therefore supposedly did not conceal any information from, or make any misrepresentations to, NRIA.  However, as AJ concedes, it was not until after Salzano's arrest that AJ disclosed his acceptance and misappropriation of the Cash to NRIA. Thus, AJ undisputedly concealed his receipt and misappropriation of the Cash from the time that he received it from Investor C, in violation of NRIA corporate policy – only revealing it to NRIA when he determined that it would best serve his interests to reveal his misdeeds.  Accordingly, Count IX should not be dismissed.

      46.    As discussed above, in arguing that Counts VII and VIII of the Amended Complaint should be dismissed, AJ relies upon the flawed premise that NRIA is required to prove its entire case during this motion to dismiss stage.  However, as demonstrated herein, the Amended Complaint need <u>not</u> provide detailed factual allegations. <u>Twombly</u>, 127 S. Ct. at 1964. Rather, NRIA need only plead enough facts to state a claim for relief that is plausible on its face, which NRIA submits it has amply accomplished in the Amended Complaint.  Accordingly, the Motion to Dismiss must be denied. <u>See Hedges v. U.S.</u>, 404 F.3d 744, 750 (3d Cir. 2005) (holding that the moving party bears the burden to demonstrate that no claim has been presented).

      47.    Further, whether or not AJ was acting at the direction of Salzano in accepting the Cash from Investor C, AJ's fiduciary duty was to NRIA, not to Salzano. <u>See Kaye v. Rosefielde</u>, 223 N.J. 218, 229, 121 A.3d 862, 869 (2015) ("[L]oyalty from an employee to an

employer consists of certain very basic and common sense obligations. An employee must not while employed act contrary to the employer's interest."); see also Cameco, Inc. v. Gedicke, 157 N.J. 504, 724 A.2d 783 (1999) (describing the duty owed by employees to their employers). AJ knew or should have known that accepting Cash from investors was against NRIA corporate policy – and that direction from Salzano did not somehow cleanse him of this violation of his duties to NRIA. Consequently, Counts VII and VIII should not be dismissed.

48.     AJ also contends that Count V of the Amended Complaint should be dismissed because NRIA failed to state a plausible claim for turnover, as fraudulently transferred funds presumably are not property of the estate until the transfer is avoided. However, the Amended Complaint seeks both avoidance of the transfer *and* turnover of the Cash. Fed. R. Civ. P. 18(b), made applicable to adversary proceedings by Fed. R. Bankr. P. 7018 provides, in relevant part, that:

> A party may join two claims even though one of them is contingent on the disposition of the other. . . . In particular, a plaintiff may state a claim for money and a claim to set aside a conveyance that is fraudulent as to that plaintiff, without first obtaining a judgment for the money.

Fed. R. Civ. P. 18(b). NRIA's approach is entirely consistent with Fed. R. Civ. P. 18(b). This Court has ample power and authority to enter a single judgment directing both the avoidance of the transfers of the Cash and the recovery of the Cash for the benefit of the estate. See Sklar v. Susquehanna Bank (In re Glob. Prot. USA, Inc.), 546 B.R. 586 (Bankr. D.N.J. 2016) (ordering both the avoidance and the recovery of the transfers at issue in a single opinion and order); see also Seitz v. Frorer (In re Covenant Partners, L.P.), 531 B.R. 84, 100 (Bankr. E.D. Pa. 2015) (rejecting defendants' argument that until an adjudication of the avoidance claim is made in the trustee's favor, the trustee's request to disallow the defendants' Proofs of Claim on that basis is unripe). As such, Count V should not be dismissed.

49.    Finally, while the Motion to Dismiss requests dismissal of the entire Adversary Proceeding with prejudice, AJ's Motion to Dismiss fails to specifically reference or even address Count VI of the Amended Complaint, which alleges conversion of the Cash by AJ. As such, AJ certainly has not met his burden to show that no claim has been presented for which relief can be granted with respect to Count VI.  Even if AJ had properly sought dismissal of Count VI – which he has not – any such effort would fail.  As discussed above, the Amended Complaint alleges that AJ has admitted to accepting and receiving Investor C's Cash in contravention of NRIA corporate policy, and that he and his co-Defendants subsequently failed to deposit such Cash in an NRIA account or otherwise utilize the Cash for NRIA's benefit.  For these reasons, Count VI of the Amended Complaint should not be dismissed.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, NRIA respectfully requests that the Court deny the Motion to Dismiss, and grant NRIA such other and further relief as the Court deems just and proper.

Dated:  Morristown, NJ
            January 17, 2023

**RIKER DANZIG LLP**

By: /s/ Joseph L. Schwartz
Joseph L. Schwartz (JS-5525)
Tod S. Chasin (TC-0122)
Daniel A. Bloom (DB-6392)
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
jschwartz@riker.com
tchasin@riker.com
dbloom@riker.com

*Attorneys for Plaintiff, National Realty
Investment Advisors, LLC*

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

JOE FRANTATORO, CHRIS MARINAKOS, KERRY NEWBERT, SIDNEY AND HELEN REISS, NICK WILLIAMS, and JOHN RIZZO, individually and on behalf of all others similarly situated,

      Plaintiffs,

      v.

REY E. GRABATO II; DANIEL O'BRIEN; THOMAS NICHOLAS SALZANO; ARTHUR SCUTARO;. ARTHUR RAYMOND SCUTARO, Sr., ARTHUR RAYMOND SCUTARO, Jr., OLENA BUDINSKA; IVEL TURNER; JEFF ROSENBERG; MARK KORCZAK; BYRON CARTOZIAN; and BRIAN HARRINGTON.

      Defendants.

Civil Action No. _____

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933, EXCHANGE ACT OF 1934, and STATE SECURITIES LAWS**

JURY TRIAL DEMANDED

Plaintiffs, Joe Frantatoro ("Frantatoro"), Chris Marinakos ("Marinakos"), Kerry Newbert ("Newbert"), Sidney and Helen Reiss ("Reiss Plaintiffs"), Nick Williams (formerly known as Carey S. Williams), and John Rizzo ("Rizzo") individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against National Realty Investment Advisors LLC ("NRIA"), Rey E. Grabato II ("Grabato"), Daniel Coley O'Brien ("O'Brien"), Thomas Nicholas Salzano ("Salzano"), Arthur Scutaro ("Scutaro"), Arthur Raymond Scutaro, Sr. ("Art Scutaro"), Arthur Raymond Scutaro, Jr. ("AJ Scutaro"),Olena Budinsak ("Budinsak"), Ivel Turner ("Turner"), Jeff Rosenberg ("Rosenberg"), Mark Korczak ("Korczak"), Byron Cartozian ("Cartozian"), and Brian Harrington ("Harrington") (collectively, "Defendants"), alleges the following based upon information and belief. Plaintiffs' information and belief is based

upon other things, their counsel's investigation, which includes without limitation: (a) a review of the Defendant's public documents; (b) New Jersey Bureau of Securities Summary Cease and Desist Order; (c) United States Securities Exchange Commission ("SEC") filings; (d) review and analysis of court filings in the matter of *In re National Realty Investment Advisors, LLC*, Case No. 22-14539 (Bankr. D.N.J.); (e) review and analysis of court filings in *SEC v. Nat'l Realty Investment Advisors LLC*, Case No. 2:22-cv-06066 (D.N.J. Oct. 13, 2022); (f) review and analysis of press releases regarding reports and advisories about NRIA, Grabato, O'Brien, Salzano, and Scutaro; and (g) other information readily available on the internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.        This is a class action on behalf of a class consisting of all persons and entities other than Defendants, including Grabato, O'Brien, Salzano, and Scutaro who purchased "membership units" in the NRIA Partners Portfolio Fund I LLC ("NRIA Fund") from at least February of 2018 to January of 2022 (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violation of the federal securities laws and to pursue remedies under Sections 12(a) of the Securities Act of 1933 (the "Securities Act"), 10(b) and 15(c) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Plaintiffs also seek to recover compensable damages caused by Defendants' violations of New Jersey statutory and common law, including N.J.S.A. § 49:3-52(a)-(c).

2.        Defendants offered and sold at least $630 million worth of membership units in the NRIA Fund during the Class Period to at least 1,800 investors. Defendants used NRIA and the NRIA Fund to carry out a fraudulent scheme, including making and disseminating material

misrepresentations, and effectuating a Ponzi scheme to divert millions of dollars invested in the NRIA Fund for their own personal gain.

3.      NRIA claimed the NRIA Fund was a billion-dollar real estate development firm focused on the development of townhomes, condominium complexes, luxury residences, and mixed-use rental developments. The NRIA Fund's model purported to take advantage of the purchasing of land or property at below-market prices, developing the land or property, and then selling it for a profit.

4.      Despite promising investors a guaranteed 12% annual return with yearly distributions, Defendants misrepresented the NRIA Fund's financial condition by intentionally misappropriating investor funds to create the false appearance that the NRIA Fund was generating revenue from their successful real estate development operations. In reality, investors were paid "distributions" and "returns" that were actually funds from prior investors. Investors' funds were being used to pay other investors their distributions, fund the Salzano family's personal, luxurious expenses, retain companies to scrub the internet free of Defendants Salzano and Scutaro's fraudulent past, and extend undisclosed loans to entities operated by the Defendants' families.

5.      Investors were never informed that their funds were not being used for the development of real estate or real estate related investments, which was the supposed purpose of the NRIA Fund.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under the federal securities laws and are pursuant to Sections 12(a) of the Securities Act, 10(b) and 15(c) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

7.      This Court has personal jurisdiction over the Defendants because, during the Class

Period, the operative events and fraud originated in New Jersey. Defendants Grabato, Salzano, Scutaro, Budinska, Turner, Rosenberg, Korczak, Cartozian, and Harrington are all domiciled and reside in Secaucus, New Jersey. Defendant O'Brien resides in New York but is actively engaged in business within New Jersey throughout the Class Period through his position as manager of the NRIA portfolio of commercial mortgage-backed securities. He also wholly owned entities which were related to NRIA, including 44 Capital Management Corp., a New Jersey corporation. Further, NRIA, which the Defendants operated in furtherance of their scheme to defraud, maintained offices in the District of New Jersey.

8.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1331, §27 of the Exchange Act (15 U.S.C. §78aa), and §22(a) of the Securities Act (15 U.S.C. §77v(a)) because this action arises under the laws of the United States, Exchange Act, and Securities Act.

9.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) as the District of New Jersey is the judicial district in which a substantial part of the events giving rise to the claim occurred, which was the nationwide offering and sale of membership units in the NRIA Fund. Venue is proper in this judicial district pursuant to §27 of the Exchange Act as the Defendants are found to conduct business within the District of New Jersey. Venue is proper in this judicial district pursuant to §22 of the Securities Act as the Defendants transacted business and offered and sold securities within the District of New Jersey.

10.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone

communications, and employed a nationwide advertising campaign, including radio advertisements and other internet advertisements.

## PARTIES

### A. Plaintiffs

11.     Plaintiff Joe Fratantoro is an individual domiciled and residing in Mount Laurel, New Jersey. Plaintiff Fratantoro invested a total of $152,700.00 as a self-directed IRA through Madison Trust in the NRIA Fund during the Class Period and suffered damages as a result of the federal securities laws violations alleged herein.

12.     Plaintiff Chris Marinakos is an individual domiciled and residing in Scottsdale, Arizona. Plaintiff Marinakos invested a total of $800,000.00 in the NRIA Fund during the Class Period and suffered damages as a result of the federal securities laws violations alleged herein. Plaintiff Marinakos has only received a total of $127,500.00 in total dividends.

13.     Plaintiff Kerry Newbert is an individual domiciled and residing in Lewes, Delaware. Plaintiff Newbert invested a total of $1,484,703.00 in the NRIA Fund during the Class Period and suffered damages as a result of the federal securities laws violations alleged herein. Plaintiff Newbert relied on representations made by Defendant and NRIA salesperson, Ivel Turner when deciding to invest. Plaintiff Newbert has only received $144,107.00 in dividends since investing over a million dollars.

14.     Plaintiffs Sidney and Helen Reiss are individuals who are domiciled and reside in Deerfield Beach, Florida. The Reiss Plaintiffs invested a total of $250,000.00 worth of their savings and income in the NRIA Fund during the Class Period and suffered damages as a result of the federal securities laws violations alleged herein. The Reiss Plaintiffs relied on the expertise and misrepresentations of Defendant and NRIA salesperson, Jeff Rosenberg when deciding to

invest. The Reiss Plaintiffs are retired seniors who rely on their investment's monthly payments to support their daughter, son in-law, and grandchildren.

15.     Plaintiff Nick Williams is an individual domiciled and residing in Boca Raton, Florida. Plaintiff Nick Williams, formerly known as Carey S. Williams, invested a total of $1,000,000.00 in the NRIA Fund during the Class Period and suffered damages as a result of the federal securities laws violations alleged herein.

16.     Plaintiff John Rizzo is an individual domiciled and residing in Baldwin, New York. Plaintiff John Rizzo invested a total of $2,069,360.00 in the NRIA Fund during the Class Period and suffered damages as a result of the federal securities laws violations alleged herein. Plaintiff Rizzo relied on the expertise and misrepresentations by Defendant Brian Harrington, Senior Project Manager for NRIA.

## B. Defendants

17.     Defendant Rey E. Grabato II is an individual domiciled in, based on information and belief, Hoboken, New Jersey. During the Class Period, Grabato was the majority owner, president, and chief executive officer of NRIA. Grabato diverted over $4 million worth of investor funds to his own personal accounts, or those of entities he controlled.

18.     Defendant Daniel Coley O'Brien is an individual domiciled in, based on information and belief, Southampton, New York. During the Class Period, O'Brien was a part owner, Co-Chief Information Officer of NRIA, was in charge of managing NRIA's portfolio of commercial mortgage-backed securities, and was sole owner of NRIA Capital Partners, Inc. O'Brien diverted over $6 million worth of investor funds, through ownership of his controlled entities, to line his own pockets.

19.     Defendant Thomas Nicholas Salzano is an individual domiciled in, based on information and belief, Secaucus, New Jersey. During the Class Period, Salzano was a Vice President of NRIA, Portfolio Manager of NRIA, and controlled the day-to-day activities of the NRIA Fund from the Fun's inception in February 2018 until his arrest in March of 2021. Salzano carried a history contaminated with fraudulent activity, including a $50 million judgment entered against him by the Federal Trade Commission and arrest on March 4, 2021 for his role in a fraudulent scheme involving a company called NorVergence, Inc. ("NorVergence").

20.     Defendant Arthur Scutaro is an individual domiciled in, based on information and belief, Bloomfield, New Jersey. During the Class Period, Scutaro was Vice President of the NRIA Fund and was also involved and implicated in the same fraudulent scheme with Salzano at NorVergence. It is believed that while he was defrauding NorVergence customers with Salzano, Scutaro was spelling his name as "Arthur S. Scuttaro".

21.     Defendant AJ Scutaro is an individual domiciled in, based on information and belief, Manalapan, New Jersey. During the Class Period, Defendant AJ Scutaro was Assistant Senior Vice President of the NRIA Fund and involved in fraudulent schemes with Salzano, including diverting investment funds for personal use. AJ Scutaro had direct communication with Class Members, directly soliciting investments. Upon information and belief, AJ Scutaro is the brother of Scutaro, and the son of Art Scutaro,

22.     Defendant Aruthur Raymond Scutaro, Sr., is an individual domiciled in, based on information and belief, Broomfield, New Jeresey. During the Class Period, Defendant Art Scutaro was employed by the NRIA and involved in fraudulent schemes with Salzano, including diverting investor funds for personal use. Defendant Art Scutaro directly solicited investments. Upon information and belief, Defendant Art Scutaro is the father or Artur Scutaro and AJ Scutaro.

7

23.    Defendant Olena Budinska is an individual domiciled and residing in, based on information and belief, Secaucus, New Jersey. During the Class Period, Defendant Budinska was married to Defendant Salzano and was paid more than $2 million for a no-show position she "held" with the NRIA Fund. Defendant Budinska also held the title of Treasurer of the NorVergence Foundation Inc., which was an imposter entity created by NorVergence.

24.    Defendant Ivel Turner is an individual domiciled and residing in, based on information and belief, Hillside, New Jersey. During the Class Period, Defendant Ivel Turner promoted and sold at least $1,634,704.00 worth of membership units in the NRIA Fund to Plaintiffs and Class Members as an NRIA salesperson and Senior Vice President of Investor Relations. Ivel Turner is not, and has never been, registered as a broker-dealer or registered investment adviser with the SEC or FINRA. Defendant Turner was also the Vice President of Training at NorVergence—the entity used by Salzano to effectuate a separate fraudulent scheme. Lastly, Defendant Turner was the Trustee of the Summer Ave. Trust—the entity used by Defendants to complete "straw" purchases, which gave a false appearance of significant demand for the NRIA Fund's projects.

25.    Defendant Jeff Rosenberg is an individual domiciled and residing in, based on information and belief, Highlands, New Jersey. During the Class Period, Defendant Jeff Rosenberg promoted and sold at least $500,000.00 worth of membership units in the NRIA Fund to Plaintiffs and Class Members as an NRIA salesperson and Vice President of Project Management. Defendant Rosenberg is not, and has never been, registered as a broker-dealer or registered investment adviser with the SEC or FINRA.

26.    Defendant Mark Korczak is an individual domiciled and residing in, based on information and belief, Whippany, New Jersey. During the Class Period, Defendant Korczak

promoted and sold at least $1,275,000.00 worth of membership units in the NRIA Fund to Plaintiffs and Class Members as an NRIA salesperson and Vice President of Project Management. Defendant Korczak is not, and has not ever been, registered as a broker-dealer or registered investment adviser with the SEC or FINRA.

27.     Defendant Byron Cartozian is an individual domiciled and residing in, based on information and belief, Rye Brook, New Jersey. During the Class Period, Defendant Cartozian promoted and sold at least $150,000.00 worth of membership units in the NRIA to Plaintiffs and Class Members as a salesperson and Senior Project Manager for NRIA. Defendant Cartozian is not and has never been registered as a broker-dealer or registered investment advisor with the SEC or FINRA.

28.      Defendant Brian Harrington is an individual domiciled and residing in, based on information and belief, Newark, New Jersey. During the Class Period, Defendant Cartozian promoted and sold at least $190,000.00 worth of membership units in the NRIA to Plaintiffs and Class Members as a salesperson and Senior Project Manager for NRIA. Defendant Cartozian is not and has never been registered as a broker-dealer or registered investment advisor with the SEC or FINRA.

## **FACTUAL BACKGROUND**

29.     NRIA was formed in 2006 by Defendants Salzano and Grabato as a real estate investment company that utilized limited liability companies to allow investors the opportunity to invest in the building and renovation of real estate.

30.     The NRIA Fund was organized in February of 2018 as a Limited Liability Company registered in Delaware. During the Class Period, the NRIA Fund promised investors annual distributions of 6% with the possibility of receiving up to a total of 21% return on their investment.

31.     The Defendants offered and sold membership units in the NRIA Fund through the issuance of private placement memoranda advertising the purpose of the NRIA Fund to be the development of real estate on property purchased at below-market value prices with the goal to develop and sell it for a large profit.

32.     Instead of using investor funds to go towards the development of real estate on such properties, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano diverted investor funds to pay distributions to prior investors, fund the Salzano family's luxurious lifestyle, and pay reputation management firms to clean Defendants' history tainted with previous frauds.

33.     Throughout the Class Period, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano used NRIA and the NRIA Fund to carry out a nationwide securities fraud and Ponzi scheme where Defendants offered and sold over $600 million worth of securities in the form of "membership units" in the NRIA Fund to approximately 2,000 investors. In addition, the NRIA Fund charged improper and excessive management and development fees to investors.

34.     During the Class Period, the Defendants were able to convince approximately 2,000 investors to invest over $600 million in the NRIA Fund. Many of these investors were retired individuals who invested in the NRIA Fund through their retirement accounts.

35.     As discussed infra, multiple unacceptable business decisions lead the Defendants to begin misusing investors' funds as an attempt to bury a series of lies and misrepresentations withheld from investors during the Class Period.

**SUBSTANTIVE ALLEGATIONS**

36.     In addition to effectuating a Ponzi scheme, which diverted millions of dollars' worth of investor funds to the Defendants, their families, and entities they controlled, the

10

Defendants materially misled investors by formulating a series of lies and omissions designed to hoodwink investors from realizing the truth regarding Defendants, the use of their funds invested with the NRIA Fund, and purported success of the NRIA Fund and its projects.

**A.  The Reality of Salzano's Past and His Role in the Management of the NRIA Fund**

37.    Public offering documents for the NRIA Fund circulated to investors by the Defendants named Grabato as its President while also stating that NRIA, which was owned by Defendants Grabato and O'Brien, would manage the NRIA Fund.

38.    Despite these representations, and as an attempt to conceal the true leadership and management of the NRIA Fund, the Defendants failed to inform investors that Salzano, who carries a fraudulent-ridden past, controlled the NRIA Fund from its inception in February of 2018 until his departure from NRIA in October 2021. PPMs described Salzano as a "Senior Independent Executive Advisor and Portfolio Manager" with the following bio:

> 25+ year background in development, construction, finance, and property management. Has been with NRIA since its inception, and instrumental in the operations and exceptional track record produced to-date. Managed over 40 large scale ground-up development projects ranging from $5M to $50M+ per site. To-date has supervised and brought to market over 1,000 finished investment property units; valued in excess of $600M. Coordinated financing for investment buyers of over $300M (debt & equity). Graduate of Rutgers University with a degree in Business and Political Science.

39.    Despite his title as "Senior Independent Executive Advisor and Portfolio Manager," Salzano controlled the NRIA Fund and was the leader behind the fraudulent scheme executed through the Fund. Salzano's career as a perpetual defrauder was never disclosed to investors and was a material omission regarding who was managing the funds invested by the Plaintiffs and Class Members.

40.    As previously mentioned, Salzano made a career by engaging in fraudulent activity and even faced criminal and regulatory prosecution on multiple occasions prior to and during his

tenure as manager of the NRIA Fund. For example, in 2005 judgment was entered against NorVergence, Inc. ("NorVergence"), a New Jersey company founded by Salzano and his brother, Peter Salzano[1], for defrauding customers.

41.     Regardless of his title as a "consultant", Defendant Salzano managed NorVergence and acted as their Chief Operating Officer.

42.     According to the New Jersey Securities Action entered against NRIA's key actors, which included but was not limited to, Defendant Salzano, NorVergence leased a device known as the "Matrix Box" to unsophisticated small businesses. Defendant Salzano and NorVergence falsely represented to customers that the device reduced per-minute local and long-distance bills by converting all oral communications into data.

43.     Once NorVergence and Salzano secured the leases, they transferred the lease to a leasing company, received an upfront cash payment, and spent most of such cash to pay for marketing to generate more customers in order to keep the scheme alive. However, very little money remained with NorVergence and, ultimately, NorVergence was unable to continue adding enough customers to pay their suppliers and carriers, which resulted in the company filing for Chapter 11 bankruptcy that converted into a Chapter 7 liquidation of assets. This conspiracy was termed the "Matrix Scheme" as a combination of a Ponzi scheme and bust-out scheme whereby schemers, including Defendant Salzano, caused NorVergence to place orders with vendors on credit, reselling the products at a reduced price, shut down the business, and take the profits from the sales without repaying the vendors.

44.     The Federal Trade Commission ("FTC") took notice of NorVergence and Defendant Salzano's fraudulent activities and charged him with fraudulent transfers under 11

---

[1] In addition to Salzano, Defendants Scutaro and Turner were also employed by NorVergence during this time. Scutaro was the Vice President of Application Screening and Turner was the Vice President of Training at NorVergence.

U.S.C. §§ 544(b), 548, and 550, as well as under New Jersey law. Defendant Salzano was also charged with conversion, misappropriation, unjust enrichment, breach of fiduciary duty, and fraud. Salzano settled these charges by agreeing to pay $50 million, which was suspended due to this inability to pay.

45.    Next, in 2009, Salzano was indicted by a Louisiana grand jury with three counts of money laundering, conspiracy, and theft for defrauding businesses in relation to his scheme to defraud during his time at NorVergence. In 2013, Salzano pled guilty to charges of theft and was forced to pay restitution and serve three years of supervised probation in New Jersey. During this time, Salzano and NRIA began soliciting and receiving investments on behalf of NRIA.

46.    Notwithstanding Salzano's history replete with fraud and criminal conduct, the Defendants never disclosed his concerning past with investors, and, in fact, using investor's funds, took considerable steps to conceal his fraudulent past.

47.    For example, according to the SEC's complaint against NRIA and the Defendants (*SEC v. Nat'l Realty Investment Advisors LLC*, Case No. 2:22-cv-06066 (D.N.J. Oct. 13, 2022)), Defendant Grabato, in an attempt to conceal Salzano's role in the NorVergence fraud, paid more than $344,000.00 worth of investor funds to a technology firm in India that created "twenty-five decoy websites that would distract investors from accurate information about the NorVergence fraud if they searched terms relating to NorVergence or Thomas Salzano." Therefore, in addition to withholding material information concerning Salzano's fraudulent past, the Defendants also deceived investors by withholding material information regarding the use of their funds to assemble obstacles to investors' ability to discover NRIA leadership's fraudulent history.

48.    As discussed supra, Salzano's fraudulent past was concealed so he could, again, orchestrate a fraud as a control person with NRIA. Despite his title as "Senior Independent

Executive Advisor and Portfolio Manager", Salzano controlled the NRIA Fund and: (i) steered

business to U.S. Construction, Inc., where his son was an owner and CFO; (ii) responded to angry

investor inquiries and complaints—even drafting emails for fellow Defendants to use in response

to irritated clients, and circulated a "training" email to Defendants and other NRIA employees

explaining how to respond to accusations that the NRIA Fund operated as a Ponzi scheme; (iii)

directed fellow Defendants to increase the guaranteed return on NRIA investments advertised to

investors; (iv) influenced the removal of accurate language to be included in PPM's because he

believed such language would discourage investors from investing; (v) admonished Defendants

and other NRIA employees for changing the terms on agreements, and threatened them if such

terms did not comply with his standards; (vi) directed NRIA to purchase office supplies from his

brother, Peter Salzano, and his company, Network Digital; and (vii) instructed Defendants and

NRIA employees whether or not they were authorized to enter into transactions or complete

assignments related to the NRIA Fund.

49.     Sheltered by the efforts taken to conceal his past and the Defendant's minimization

of his role regarding the NRIA Fund, Salzano's fraudulent disposition once again emerged during

his time at NRIA, and the Defendants actively concealed these facts from investors.

### *Salzano Induced Investments Based on a Forged Terms Sheet*

50.     On January 17, 2019, Salzano undertook to convince an NRIA investor to increase

their investment in a "new opportunity" to invest in a property in North Bergen, New Jersey

supposedly owned by NRIA by claiming a lender, Genesis Capital, LLC ("Genesis Capital") had

agreed to provide financing for the project. He presented the investor with a Letter of Intent,

purportedly signed by the Genesis Capital CEO indicating that Genesis Capital agreed to finance

the project.

51.    In reality, the Genesis Capital CEO had never signed the Letter of Intent, nor agreed to provide financing for the project.

52.    When Genesis learned of the forgery, they immediately sent a cease-and-desist letter addressed to Defendants Grabato and O'Brien stating that the Letter of Intent was a fraud and the supposed signature of their CEO had been forged. Genesis noted that the term sheet was created using the letterhead and text from an authentic term sheet executed with NRIA two years prior, which involved a completely different project. In response to the cease-and-desist letter sent by Genesis, Salzano attempted to characterize the forgery as a one-off mistake and sent an email to the NRIA investor, which included Defendant Scutaro, explaining that the email containing the forged Letter of Intent was a mistake and not labeled as "EXAMPLES ONLY".

53.    Despite Defendants Grabato and O'Brien being placed on notice of Salzano's forgery, they took no action against him, concealed his actions from investors, and continued to allow Salzano to exert control and authority over the administration of the NRIA Fund.

54.    On March 4, 2021, Salzano was arrested for wire fraud and aggravated identity theft as a result of his attempt to induce an investor into investing in a project with a fraudulent Letter of Intent indicating the project received financing. Defendants Grabato, O'Brien, and Scutaro did not disclose Salzano's arrest to investors until March 22, 2021 and attempted to downplay his role in the administration of the NRIA Fund by describing Salzano as an "Independent Contractor" while characterizing the incident as "isolated". Grabato, O'Brien, and Scutaro claimed to place Salzano on suspension and remove him from any activities involving NRIA, but this was false and Salzano continued to play an active role in the administration of the NRIA Fund until October of 2021.

*Salzano Attempts to Present Forged Documents to TD Bank*

55.     According to the New Jersey Securities Action, Salzano continued his fraudulent acts by presenting TD Bank with forged documents seeking payment of $20 million for NRIA's project known as "Hoboken Heights". Funding for the Hoboken Heights project was supposedly being guaranteed under a nonexistent standby letter of credit by Deutsche Bank.

56. In order to secure the $20 million from TD Bank, the bank required a MT760 ("SWIFT message"), which guaranteed Deutsche Bank had set aside the $20 million to be able to fund the guarantee. On May 8, 2021, Salzano forwarded TD Bank bank identifier information but was immediately informed by a TD Bank representative that such documentation was insufficient to qualify as a SWIFT message. Subsequently, the TD Bank representative also informed Defendants Salzano and Grabato that Deutsche Bank had not actually issued Salzano a standby letter of credit.

57. Salzano proceeded to present TD Bank with two forged SWIFT messages all while pressuring TD Bank to pay the $20 million via email in June of 2019. TD Bank recognized the forgery, and on June 7, 2019, informed Salzano that they were aware the SWIFT messages were not sent by Deutsche Bank, and requested their name not be associated with the Hoboken Heights project. In a futile attempt to cover his tracks, Salzano then claimed a "hacker" was responsible for the emails and forged documents presented to TD Bank.

*Defendants Grabato, O'Brien, and Scutaro, Art Scutaro, andAJ Scutaro Knew of Salzano's Past, Actively Withheld and Concealed his Past and Present Frauds, and Continued to Permit him to Exert Authority Over the NRIA Fund.*

58. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, and AJ Scutaro, were fully aware that Salzano had previously been involved in a fraud involving NorVergence, that he presented an investor with a forged Letter of Intent attempting to fraudulently induce an investment, and

presented TD Bank with multiple forged SWIFT messages, yet still permitted Salzano to exert authority and control over the NRIA Fund.

59. Defendant Grabato used funds invested in the NRIA Fund (supposedly going towards real estate projects) to pay overseas reputation management firms to assist them in suppressing the truth regarding Salzano's fraudulent past. Further, despite multiple acts of fraud and crime during Salzano's tenure as head of the NRIA Fund, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, and AJ Scutaro suppressed these fraudulent acts and omitted such material information in conversations with investors. Salzano's forgery was suppressed for approximately two years until his arrest in March of 2021, which initiated a misleading disclosure to investors downplaying Salzano's role and actions.

60. Even worse, Defendants Grabato, O'Brien, Scutaro, Art Scutaro and AJ Scutaro continued to allow a criminal such as Salzano, with an extensive record of fraud, to continue controlling and directing the NRIA Fund and its projects. The above-mentioned Defendants had more than enough cause, and a duty to their investors to remove Salzano from being connected with anything involving NRIA and the administration of the NRIA Fund.

**B. The Defendants' Fraud in the Offer and Sale of Membership United in the NRIA Fund**

61. As previously stated supra, the NRIA Fund was organized to acquire equity interests in LLCs to serve as the owner and manager and would invest in real estate development assets. In exchange for the NRIA Fund's services as the developer of real estate assets, NRIA was entitled to receive a share of profits and a fee of up to three percent of the purchase price of each property they managed and developed. Investments with the NRIA Fund were in the form of "membership units", which were nationally advertised through the radio, television, internet, and New Jersey billboards as investments guaranteeing a return on investment of at least 12%. The Defendants'

offer and sales of membership units in the NRIA Fund were made pursuant to Private Placement
Memoranda ("PPMs") distributed nationwide to investors. This advertising campaign resulted in
the sale of over $600 million worth of membership units in the NRIA Fund to approximately 2,000
investors, including to hundreds of retirees.

62. Despite Defendants' assurances that Plaintiffs' and Class Members' investments in the
NRIA Fund would be used to fund the investments in underlying operating companies in exchange
for cash flows received from the investments, Defendants Grabato, O'Brien, Salzano, Scutaro Art
Scutaro, AJ Scutaro, and Turner through their positions with NRIA, made a series of material
misrepresentations and omissions in the offer and sale of membership units in the NRIA Fund.

### Defendants Conducted a Ponzi Scheme to Misrepresent the NRIA Fund's Success and Made Distributions to Previous Investors

63. PPMs distributed to investors claimed the use of the offering's proceeds would be used
"for the equity investments in the Manager Investment Companies that hold and operate the
properties in the Partners Fund, make investments in Real Estate-Related Investments as well as
support administrative and operating expenses, working capital requirements, and other general
corporate purposes." The PPMs further assured investors they would receive at least a 12%
annualized return and that NRIA would cover any shortfall.

64. But these PPMs were filled with material misrepresentations, including the use of
investors' funds and source of distributions being made to investors. Instead of going towards the
supposed real estate development projects, the above-mentioned Defendants used investors'
contributions to cover distributions being paid out to previous investors. According to the SEC's
complaint against NRIA and the Defendants (*SEC v. Nat'l Realty Investment Advisors LLC*, Case
No. 2:22-cv-06066 (D.N.J. Oct. 13, 2022)), since the NRIA Fund's inception through June 14,
2021, it paid approximately $13.8 million of distributions with the majority of payments being

made with investors' funds—not cash flows from real estate investments. The SEC Complaint states that "from March through June 19, 2018, the [NRIA] Fund received $904,407 in contributions from investors. During that same time period—when the [NRIA] Fund's bank account had no other deposits—$138,513 in distributions was paid out to investors."

65. The answer to the inevitable question of "where was the NRIA Fund coming up with such funds to pay out these distributions?" became quite clear—new investor deposits.

66. NRIA, in an attempt to justify its mishandling of investors' funds, did not disclose that investor funds would be used to pay distributions to other investors until a PPM randomly began making such disclosure (after investors had already been paid distributions from other investors for years).

*Defendants Grabato, O'Brien, and Salzano Disseminated Fraudulent Financial Information to Investors Regarding the NRIA Fund, its Offerings, and Current Financial Condition to Misrepresent the NRIA Fund's Success*

67. Defendants Grabato, O'Brien, and Salzano disseminated PPMs representing that the NRIA Fund would be using the "cash method" of accounting. But this was not accurate. In reality, the above-mentioned Defendants distributed financial information to investors collected from NRIA's (not the Fund) consolidated financial statements, which were prepared using the general accepted accounting principles ("GAAP").

68. Financial statements distributed to potential and current investors in the NRIA Fund were materially misleading because they did not actually depict the financial condition of the NRIA Fund, but rather of NRIA, the entity, itself. Further, despite lying about the method of accounting used, the revenue reported to investors was, in fact, not earned and, therefore, not in compliance with GAAP—the accounting method the above-mentioned Defendants failed to disclose they were using in the first place. Nonetheless, according to the SEC's complaint against

NRIA and the Defendants, even if they would have complied with GAAP, "almost none of the revenue would have been recorded."

69. The financial information communicated to investors failed to disclose the revenue that was recorded was not actually consistent with either the cash method or GAAP. Investors were misled into believing the NRIA Fund was performing much better than it really was.

70. Despite the misrepresentations resulting from the use of NRIA, i.e., the entity's financial statements, to represent the financial condition of the NRIA Fund, NRIA itself was inflating the amount of revenue "earned" by recording revenue for development fees at the time agreements were being signed by the project's operating company. According to the SEC Complaint against NRIA and Defendants, "[t]hese fees are to be paid by the end-purchasers of the property when the project is completed and sold. Thus, in accordance with GAAP, these fees cannot be recorded until the obligation is settled and the property is transferred to the buyer."

71.    PPMs distributed to investors prominently claimed:

> A project management and development fee (the "Development Fee") of up to 3% of the capital stack attributable to the purchase of each property undertaken by the underlying Operating LLCs. The Development Fee is a property level fee for directing and project managing all development activities, including taking the properties from acquisition and bank financing through renovation or new building construction, as required, and continuing through to completion **and positioning for rent and/or resale,** as applicable. The Development Fee will be paid from a combination of the bank and loan funding, and equity contributions used to acquire the properties and build or develop such properties.

72. Defendants Grabato, O'Brien, and Salzano did not disclose to investors that they would cause NRIA to pocket the development fees up front instead of properly waiting for property to be transferred to the buyer and collect the fee.

73. Further, collecting and recording the development fees upfront as revenue grossly overstated NRIA's net income and created a false reality for investors concerning the NRIA Fund's financial condition.

74. Even more disturbing is the fact that Defendants Grabato, Salzano, and O'Brien were all aware revenue was being inflated and knowingly distributed such financial information to investors in PPMs prepared by Defendants Salzano and O'Brien. Such PPMs would also come with a cover letter signed by Defendant Grabato.

75. According to NRIA's independent accountant tasked with reviewing its financial statements, booking the development fees upfront was a departure from GAAP and improperly collected by NRIA. For example, according to the New Jersey Securities Action, "[i]n its opinion on NRIA's 2018 consolidated financial statements, its accountant stated that following GAAP would have decreased NRIA's revenue by $11,130,000.00. This would have meant approximately a 75% decrease in NRIA's revenue and fees…." The same accountant also concluded that if Defendants would have followed GAAP in their 2019 financial statements, "revenue and fees would have been decreased by $19 million."

76. According to the SEC complaint against NRIA and Defendants, in response to independent accountant inquiries regarding NRIA's misleading accounting practices, Defendant Salzano stated in an internal email, "[b]ottom line is if we don't reasonably and properly with disclosure book our fees the old-fashioned way [*i.e.*, when they sign agreements to purchase properties], we don't show a profit and we look very bad during this growth phase." Further, in internal emails between Salzano, O'Brien, and Grabato, they conceded that the projects were not profitable, and they needed to record up front development fees as revenue to make the investments look profitable. In a June 2020, email with O'Brien, Salzano expressed their need to overstate

revenues by stating, "we need these fees to show profit during the development phase…can't be break even or loss on financials—just looks bad—bad optics."

77. Clearly, Defendants Grabato, O'Brien, and Salzano were willing to go to great lengths to give investors the impression that the NRIA Fund was in stable financial condition and profitable—even if it meant providing them with falsified financial statements tainted with inflated revenues.

***Defendants Grabato, O'Brien, Scutaro, Salzano, and Turner Used "Straw Purchasers" to Create the False Impression of High Demand for the NRIA Fund's Properties***

78. The above-mentioned Defendants caused the NRIA Fund to enter into various fraudulent transactions by utilizing NRIA employees to purchase NRIA Fund development projects and create the false impression that such projects were experiencing high levels of demand.

79. Using an entity called "Summer Ave Trust", the above-mentioned Defendants caused related parties, including Defendant Turner, to purchase units of NRIA's Guttenberg properties, which was an NRIA Fund project. The Summer Ave Trust was created in October of 2019 by Web Marketing, a corporation run by Defendant Grabato's cousin, Nathania Lutero, as the Grantor and Defendant Ivel Turner as the Trustee.

80.    According to the New Jersey Securities Action, the Summer Ave Trust property involved $800,000 which was described as being transferred to the trust to "purchase Units #209 and #407 at the Green Roof"—one of NRIA's Guttenberg properties. The beneficiary of the Summer Ave Trust was Realty Holding Trust 3314, which is believed to have been controlled by Defendant Grabato.

81.    In October of 2019, NRIA transferred over $700,00.00 to Web Marketing, who then wired the funds to the title company for the purchase of Unit #'s 209 and 407 to be completed

by the Summer Ave Trust. On October 31, 2019, title for both units was conveyed to Defendant

Ivel Turner, Trustee of the Summer Ave Trust and Senior Vice President for Investment Relations

for NRIA.

82.    The New Jersey Securities Action described the transactions as follows:

> The legal fiction of this transaction is that the seller of Unit 209 and Unit 407 was
> an entity controlled by [Defendant] Rey Grabato, and the beneficiary of the
> Summer Ave Trust that purchased the units was another entity controlled by
> [Defendant] Rey Grabato, Realty Holding Trust 3314.

83. Unfortunately, this was not the only example of the above-mentioned Defendants using

"straw purchasers" to misrepresent and artificially inflate the demand of NRIA Fund projects with

the help of Web Marketing. In total, the above-mentioned Defendants caused the NRIA Fund to

loan at least $4 million of investor funds to Web Marketing for the purchase units in NRIA

development projects.

84. Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, Salzano, and Turner

neglected to inform investors their funds were being "loaned" to carry out conflict-ridden

transactions for the purpose of creating the appearance that projects developed by the NRIA Fund

were "selling out". Such an omission was material because projects developed by the NRIA Fund

were, in fact, not selling out, and these transactions gave investors the false impression that they

were investing in a project with proven success. But it was all predicated on a lie.

**Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano Failed to
Disclose to Investors That Their Investment was Actually Flowing to Their Personal
Accounts and Defendant Salzano's Family Members, Including Defendant Olena Budinska**

85. In yet another plot to divert funds to anything but the NRIA Fund's development

projects, the above-mentioned Defendants caused investor funds deposited into the Fund's main

account to be diverted to other accounts controlled by the above-mentioned Defendants or their

family members.

86. For example, from June 2020 through June 2021, approximately $1.25 million worth of investor funds were deposited into Defendant Grabato's LLC and personal accounts. From there, Grabato transferred $420,000 to Salzano's personal account and over $500,000 to Salzano's former and current spouses. Neither Salzano's current, nor former spouse was ever employed by NRIA or any of its affiliated entities.

87. Defendants Grabato, O'Brien, Scutaro, and Salzano paid Salzano's current wife, Defendant Budinska, millions of dollars' worth of investor funds for "no-show" jobs for positions with the NRIA Fund despite never being employed by the Fund or providing it with any services.

88. Next, approximately $6.7 million worth of investor funds was diverted to Defendant O'Brien through NRIA Capital Partners, Inc. and 44 Capital Management Corp., which are entities he owned and controlled. Defendant Scutaro was also diverted over $500,000 in investor funds in June of 2021.

89. The above-mentioned Defendants failed to disclose that investor funds would ***not*** be going towards the NRIA Fund's projects, but they would actually be diverting such funds to personally pay themselves and family members. This was a material omission considering that the PPMs distributed to investors did not mention anything that could be interpreted as placing investors on notice their investments would be going straight into the pockets of the above-mentioned Defendants and their family members. In fact, PPMs distributed to investors represented that their investment would go toward the following:

> It is intended that substantially all proceeds of this Offering will be used for investment in one or more Management Investment Companies, as well as administrative and operating expenses, working capital requirements, and other general corporate purposes, with broad discretion by the management of the Company. Pending this use, the Company may invest the proceeds of this Offering in money market accounts or other cash items, or other similar investments that the Company deems appropriate.

24

90. Nothing in this section of the PPM, titled **ESTIMATED USE OF PROCEEDS**, provides investors with any indication that their investment in the NRIA Fund would immediately be "loaned" to the above-mentioned Defendants and their family member' bank accounts without any obligation to repay the Fund.

***Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano Omitted that up to 25% of the NRIA Funds were Invested in Speculative Commercial Mortgage-Backed Securities***

91. Defendant O'Brien was the mastermind behind the plan to divert funds invested with the NRIA Fund to ultimately invest in commercial mortgage-backed securities. The diversion strategy involved transferring investor funds to an account at Candor Financial, which was controlled by an affiliate of NRIA called NRIA Strategies.

92. The investment strategy employed by Defendant O'Brien involved purchasing commercial mortgage-backed securities ("CMBS") with ***borrowed money***, which was supposed to increase the potential reward which could be recouped from this investment. But it also increased the investment's risk.

93. According to the New Jersey Securities Action, "at the time of the strategy, NRIA's CMBS portfolio, which had a weighted average rating of BB non-investment grade, was yielding approximately 9% per annum. This alone shows the increased risk as it was triple the yield on Government agency backed investment grade CMBS. By borrowing enough funds to purchase approximately three times the amount of CMBS than the NRIA Fund could otherwise afford without resorting to leverage, Respondents could roughly triple the yield on their equity."

94. Therefore, not only did Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJScutaro, and Salzano fail to disclose to investors that they were ever investing their funds into CMBS, but

they also failed to disclose that the CMBS purchased were *speculative* and bought with *borrowed funds*.

95. Any indication in PPMs distributed to investors that Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano would cause the NRIA Fund to use investor funds to invest in low-grade CMBS was materially misleading and coined as a potential venture. It certainly omitted that a quarter of all investor funds would be invested in CMBS to offset the NRIA Funds' failures surrounding its real estate development projects.

96. For example, a PPM dated March 22, 2021, stated the NRIA Fund, "may invest a portion of investor funds in "Real Estate-Related Investments" such as CMBS and RMBS." Real Estate-Related Investments was defined in other PPMs as "U.S. government enterprise backed residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS"), which may include mortgage pools guaranteed, in whole or in part, by Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association."

97. Despite using ambiguous language neither confirming nor denying whether they would invest in mortgage-backed securities, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano also failed to disclose that the CMBS they caused the NRIA Fund to invest in were *not* "government enterprise backed commercial mortgage-backed securities", but actually invested in CMBS that caused their portfolio to retain a yield (9% per annum) that was three times that of Government backed CMBS.

98. In a last-ditch effort to cover up the NRIA Fund's failed real estate development projects, the above-mentioned Defendants caused the NRIA Fund to bleed their invested funds dry by investing in risky, junk CMBS. The above-mentioned Defendants cleverly concealed the misuse of investor funds by describing the NRIA Fund's potential investment in mortgage-backed

securities as something it "may" do and omitted **when** they decided to invest in CMBS and **who** the investments were through.

C.  **Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano Caused NRIA to Employ Unlicensed Salespersons to Promote Investments in the NRIA Fund and Placed Such Salespersons in Positions of Authority**

99. In order to facilitate as many investments as possible into the NRIA Fund, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano employed various NRIA salespersons that also held the title of "Vice President of Investor Relations".

100.    These salespersons included Defendants Turner, Korczak, Rosenberg, Cartozian, and Harrington (collectively "NRIA Salespersons").

101.    The NRIA Salespersons materially misrepresented the returns investors were expected to receive from their investment in the NRIA Fund by promising upwards of an 18% return, and at least a 12% investment and principal return. Specifically, Defendant Rosenberg was touting the success of the NRIA Fund and safety of the purchase of membership units by claiming that *NRIA has a bond fund with enough money to repay the investor even if NRIA has a problem selling properties.* This was a material misrepresentation and an utter lie considering the Fund *did not* have enough money to even begin to scratch the surface of paying investors back their principal.

102.    Even more disturbing is the fact that *NONE* of the NRIA Salespersons were ever registered as a broker-dealer or registered investment adviser with the SEC or FINRA. Nonetheless, Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano employed them as "NRIA salespersons" and Vice Presidents of Investor Relations for NRIA.

103.    During the Class Period, the unlicensed NRIA Salespersons promoter and sold *at least* $3,749,704.00 worth of NRIA Securities to retirees and other investors.

## CLASS ALLEGATIONS

104.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired membership units of the NRIA Fund between January of 2018 until June 7, 2022, both dates inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, and at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

105.    The members of the Class are so numerous that joinder of all is impracticable. Throughout the Class Period, Defendants caused the NRIA Fund to Defendants offer and sell at least $630 million worth of membership units in the NRIA Fund. While the exact number of Class members is unknown to the Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class. Members of the Class may be identified from records maintained by NRIA or its brokers or transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

106.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

107.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

108.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants' actions constituted a scheme to defraud investors;

©    whether statements made by Defendants to the investing public during the Class Period omitted material facts about the business, operations, and prospects of the NRIA Fund; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

109.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### *LOSS CAUSATION*

110. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

111. Because of Defendants' wrongful conduct NRIA is bankrupt, and holders of its securities have not received payments to which they are entitled.

112. During the Class Period, Plaintiffs and the Class purchased NRIA Securities under false pretenses due to the material misrepresentations and omissions committed by the Defendants. As a result, Plaintiffs and the Class Members received dismal or no interest payments at all after being promised *at least* a 12% return.

### SCIENTER ALLEGATIONS

113. As alleged herein, Defendants collectively acted with scienter because Defendants: knew that the PPMs and statements issued or disseminated in the name of NRIA or the NRIA Fund were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to investors in the NRIA Fund; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

114. As set forth elsewhere herein in detail, Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano, by virtue of their receipt of information reflecting the true facts regarding NRIA and the NRIA Fund, their control over, and/or receipt and/or modification of the NRIA Fund's allegedly materially misleading misstatements and/or their associations with NRIA and the NRIA Fund, which made them privy to confidential proprietary information concerning the NRIA Fund, facilitated the fraudulent scheme alleged herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE (AFFILIATED UTE DOCTRINE)

115. A Class-wide presumption of reliance is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the NRIA Fund's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here

### *NO SAFE HARBOR*

116.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

117.    In addition, to the extent certain statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer who knew that the statement was false when made.

## CAUSES OF ACTION

### COUNT I
**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5(a)—(c) Promulgated Thereunder
Against Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and
Salzano**

118.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

119.    During the Class Period, Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive investors in the NRIA Fund, including the Plaintiffs

and Class Members, as alleged herein; (ii) operate as a Ponzi scheme; and (iii) cause Plaintiffs and other members of the Class substantial losses. In furtherance of this unlawful scheme, plan, and course of conduct, the above-mentioned Defendants, engaged in the the actions set forth herein and are liable therefor.

120.    The above-mentioned Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) omitted to state material facts necessary to make their statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the investors in the NRIA Fund in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)—(c). The above-mentioned Defendants' fraudulent scheme of operating a deceitful business included, *inter alia*, the following material omissions and misrepresentations:

1. The omission and misrepresentation concerning Defendant Salzano's past frauds and forgery;

2. The omission that the NRIA Fund was effectuating a Ponzi scheme with investor funds;

3. The omissions that Plaintiffs' and Class Members' funds were being misused to pay the above-mentioned Defendants' family members, sanitize Salzano's fraudulent past, and invest in low-grade, speculative CMBS investments;

4. The NRIA Fund was taking up-kfront development fees, thereby misrepresenting the Fund's revenue and success;

5. "Straw purchasers" were created to purchase the NRIA Fund's development projects, thereby showing a false spike in demand for the properties;

6. The omission that the NRIA Fund actually had insufficient funds to pay investors their owed distribution payments; and

7.  Membership units in the NRIA Fund were being solicited and sold by unregistered individuals acting as brokers on behalf of NRIA and the NRIA Fund.

121.  All of the above-mentioned Defendants are sued as primary participants in the wrongful and illegal conduct.

122.  The above-mentioned Defendants, individually, and in concert, directly and indirectly,

by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the NRIA Fund's financial well-being.

123.  The above-mentioned Defendants employed devices, schemes and artifices to defraud,while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the NRIA Fund's value, which included omitting to state material facts necessary in order to make the statements made about the NRIA Fund and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of membership units in the NRIA Fund during the Class Period.

124.  The above-mentioned Defendants' primary liability arises from the following facts: (i) the above-mentioned Defendants were high-level executives and/or directors at NRIA; (ii) the above-mentioned Defendants, by virtue of their responsibilities and activities as senior officers and/or directors of the NRIA Fund, were privy to, in control of  and participated in the creation, development, and dissemination of PPMs and other communications with investors

containing material omissions or misrepresentations; and (iii) each of these defendants were aware of their own dissemination of information to investors in the NRIA Fund, which they knew and/or recklessly disregarded was materially false and misleading.

125.    The above-mentioned Defendants had actual knowledge of the omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material omissions were done knowingly or recklessly and for the purpose and effect of concealing and misrepresenting the success of the NRIA Fund from the investing public. As demonstrated by Defendants' misstatements of the NRIA Fund's business, operations, leadership, and use of investor funds throughout the Class Period, Defendants, if they did not have actual knowledge of the omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

126.    As a result of the failure to disclose material facts, as set forth above, demand for NRIA Fund projects were artificially inflated during the Class Period, investors were misled concerning the NRIA Fund's success, and investors in the NRIA Fund were shielded from the fact the Fund was managed by a criminal convicted of previous fraud crimes. In ignorance of the fact that demand of NRIA Fund properties were artificially inflated, unsuccessful, and in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by the above-mentioned Defendants during the Class Period, Plaintiffs and the other members of the Class purchased membership units in the NRIA Fund during the Class Period under false pretenses and were damaged when the NRIA Fund ceased making required interest payments.

127.    At the time of said omissions, Plaintiffs and other members of the Class were unaware of the omitted material facts and believed the statements of the above-mentioned Defendants to be true. Had Plaintiffs and the other members of the Class known the truth regarding the NRIA Fund's true financial condition, leadership, and use of their funds which were omitted by the above-mentioned Defendants, Plaintiffs and other members of the Class would not have purchased membership units in the NRIA Fund.

128.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

129.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of membership units in the NRIA Fund during the Class Period.

## COUNT II
**Violation of Section 12(a)(2) of The Securities Act**
**Against Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano**

130.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

131.    This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Plaintiffs and other Class Members.

132.    Defendants Grabato, O'Brien, Scutaro Art Scutaro, AJ Scutaro, and Salzano were sellers and offerors and/or solicitors of purchasers of membership units in the NRIA Fund pursuant to the NRIA Fund's Private Placement Memoranda distributed to investors and "sticker supplements" used to supplement the NRIA Fund's PPMs.

133.    As set forth above, PPMs distributed to Plaintiffs and Class Members contained untrue statements of material fact, omitted to state other facts necessary to make the statements

made therein not misleading, and omitted to state material facts required to be stated therein. Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano's actions of solicitation included preparing the inaccurate and misleading PPMs and participating in efforts to market membership units in the NRIA Fund to investors.

134.    Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano owed to the purchasers of membership units of the NRIA Fund, including Plaintiffs and the other Class Members, the duty to make a reasonable and diligent investigation of the statements contained in PPMs distributed to investors to ensure that such statements were accurate and did not contain any misstatement or omission of material fact. The above-mentioned Defendants, in the exercise of reasonable care, knew or should have known that the PPMs and other oral communication with investors contained misstatements and omissions of material fact.

135.    Plaintiffs and the other members of the Class purchased or otherwise acquired membership units in the NRIA Fund pursuant to PPMs distributed by the above-mentioned Defendants, and neither Plaintiffs nor the other members of the Class knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the NRIA Fund's PPMs.

136.    Plaintiffs and the Class Members are entitled to recover the consideration paid for their membership units in the NRIA Fund, less any amount of income received thereon, upon the tender of such membership units.

## COUNT III

### Violation of Section 15(c)(1)(A) of the Exchange Act
### Against the NRIA Salespersons

137.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

138.    As set forth above, the NRIA Salespersons directly or indirectly, by the use of the means or instrumentality of interstate commerce, of the mails, or any facility of any national securities exchange, used or employed, in connection with the purchase or sale, or the inducement or attempted inducement of the purchase or sale, of securities otherwise than on a national exchange, acts, practices, or courses of business that constitute a manipulative, deceptive, or other fraudulent device or contrivance.

139. By reason of the foregoing, the NRIA Salespersons violated, and unless enjoined will continue to violate Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)].

140. In particular, as set forth above, the NRIA Salespersons each violated Section 15(c)(1)(A) of the Exchange Act with their omissions that (i) Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano caused the NRIA Fund to misuse investor funds to effectuate a Ponzi scheme, clean Salzano's past, pay family members, and invest in low-grade CMBS; (ii) Defendant Salzano had a history replete with fraud and continued his fraudulent actions and forgery; (iii) Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano caused the NRIA Fund to misrepresent the amount of revenue received from its projects; and (iv) Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano caused "straw purchasers", including Defendant Turner, to purchase NRIA Fund projects, thereby inflating the demand for such properties. Further, as set forth above, the NRIA Salespersons each violated section 15(c)(1)(A) of the Exchange Act with their material misrepresentations that the NRIA Fund was a safe, suitable investment, and any indication that the NRIA Fund had enough money to repay investor even if NRIA has a problem selling the properties.

141.    The NRIA Salespersons omitted such facts and made such misrepresentations in conversations with investors across the United States to induce or investors to purchase

membership units in the NRIA Fund in exchange for large commissions. As a direct and proximate result of the wrongful conduct of the NRIA Salespersons, Plaintiffs and members of the Class suffered damages in connection with their purchase of membership units in the NRIA Fund during the Class Period.

## COUNT IV

**Violation of the New Jersey Uniform Securities Act, N.J.S.A. §49:3-52(a)-(c)**
**Against Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano**

142.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

143.    Under N.J.S.A. § 49:3-52 of the New Jersey Uniform Securities Act, provides, in pertinent part, that it shall be unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud;

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading;

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

144.    Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano are "persons" within the meaning of N.J.S.A. 49:3-49(i).

145.    Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano caused the NRIA Fund to

knowingly and intentionally make numerous material misstatements and omissions in connection with the sale of securities to Plaintiffs and Class Members in violation of §49:3-52(b) by, among other things, misrepresenting or failing to disclose:

1. Defendant Salzano's past frauds and forgery;

2. The NRIA Fund was effectuating a Ponzi scheme with investor funds;

3. Investor funds were being misused to pay the above-mentioned Defendants' family members, clean up Salzano's fraudulent past, and invest in low-grade, speculative CMBS investments;

4. The NRIA Fund was taking up front development fees, thereby misrepresenting its revenue;

5. "Straw purchasers" were created to purchase the NRIA Fund's development projects, thereby showing a false spike in demand for the properties;

6. The NRIA Fund had insufficient funds to pay investors their owed distribution payments; and

7. Membership units in the NRIA Fund were being solicited and sold by unregistered individuals acting as brokers on behalf of NRIA and the NRIA Fund.

146.    Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano made these material misrepresentations and omissions with the purpose and intent of convincing Plaintiffs and Class Members to purchase membership units in the NRIA Fund.

147.    Plaintiffs and Class Members relied on upon the above-mentioned Defendants' material misrepresentations and omissions, and their reliance was reasonable under the circumstances.

148.    Plaintiffs and Class Members did not know, and in the exercise of due diligence could not have known that Defendants were making material misrepresentations and omissions.

149.    Had Plaintiffs and Class Members known that the above-mentioned Defendants were making material misrepresentations and omissions, they would not have invested in the NRIA Fund.

150.    Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano knowingly and intentionally committed deceptive or manipulative acts in furtherance of a scheme to defraud Plaintiffs and the Class Members in violation of N.J.S.A. § 49:3-52(a), including the following:

1.  Falsely representing the leadership of NRIA and concealing Salzano's, the true manager of the NRIA Fund, fraudulent past;

2.   Causing the NRIA Fund to conduct a Ponzi scheme in an attempt to keep up with investors' distribution payments;

3.  Misuse investor funds to pay the above-mentioned Defendants' family members, clean up Salzano's fraudulent past, and invest in low-grade, speculative CMBS investments;

4.  Failed to inform investors their "revenue" was not an accurate representation of the NRIA Fund's finances due to the above-mentioned Defendants causing the NRIA Fund to take up front development fees;

5.  Artificially inflated the demand for the NRIA Fund's development projects by creating "straw purchasers" to purchase the NRIA Fund's properties;

6.  Misrepresenting the NRIA Fund's ability to pay investors their owed distribution payments; and

7. Omitted that membership units in the NRIA Fund were being sold and solicited by unregistered individuals acting as brokers on behalf of NRIA and the NRIA Fund.

151. The cited conduct by Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano also constitutes an act, practice, or course of business which operates or would operate as a fraud or deceit upon Plaintiffs and the Class Members in violation of N.J.S.A. § 49:3-52(c).

152. The Plaintiffs and Class Members would not have invested in the NRIA Fund had they known Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano caused the NRIA Fund to make the foregoing material misstatements or omissions, including the following:

1. Defendant Salzano, the true manager of the NRIA Fund, had a history of being convicted of past fraudulent crimes;

2. The above-mentioned Defendants caused the NRIA Fund to conduct a Ponzi scheme in an attempt to keep up with investors' distribution payments;

3. The above-mentioned Defendants misused investor funds to pay the above-mentioned Defendants' family members, clean up Salzano's fraudulent past, and invest in low-grade, speculative CMBS investments;

4. Plaintiffs and Class Members were not informed that the NRIA Fund's "revenue" was not an accurate representation of the NRIA Fund's finances due to the above-mentioned Defendants causing the NRIA Fund to take up front development fees;

5.  Demand for the NRIA Fund's development projects was artificially inflated with the creation of "straw purchasers" to purchase the NRIA Fund's properties;

6.  The NRIA Fund was actually unable to pay investors their owed distribution payments; and

7.  Plaintiffs and Class Members were unaware that membership units in the NRIA Fund were being sold and solicited by unregistered individuals acting as brokers on behalf of NRIA and the NRIA Fund.

153.    Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano acted intentionally, with a wrongful state of mind, in violating N.J.S.A. § 49:3-52(a), (b), and (c), as demonstrated by the cited conduct. Had the above-mentioned Defendants not violated in the manner detailed herein, Plaintiffs and Class Members would not have invested in the NRIA Fund or suffered damages in their failure to receive distribution payments.

154.    As a direct and proximate result of the above-mentioned Defendants' wrongful conduct, Plaintiffs and members of the Class have suffered millions of dollars of damages.

## COUNT V

### Common Law Fraud and Negligent Misrepresentations
### Against Defendants Grabato, O'Brien, Scutaro, Art Scutaro, AJ Scutaro, and Salzano.

155.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

156.    As set forth above, the above-mentioned Defendants made false representations to Plaintiffs and Class Members in order to induce them to purchase membership units in the NRIA Fund through the NRIA Salespersons.

157.    The above-mentioned Defendants knew at the time that these representations were made to the Plaintiffs and Class Members that they were not true.

158.   The above-mentioned Defendants made these false representations to Plaintiffs and Class Members with the goal of inducing reliance upon the false representations and investing in the NRIA Fund. Further, the Plaintiffs did in fact rely on the representations the above-mentioned Defendants caused the NRIA Fund to disseminate.

159.   The false and fraudulent representations the above-mentioned Defendants caused the NRIA Fund to make included:

1.   Defendant Salzano, was the actual true manager of the NRIA Fund, and had a history of being convicted of past fraudulent crimes;

2.    The above-mentioned Defendants caused the NRIA Fund to conduct a Ponzi scheme in an attempt to keep up with investors' distribution payments;

3.   The above-mentioned Defendants misused did not actually use investor funds to invest in real estate project but actually used them to pay the above-mentioned Defendants' family members, clean up Salzano's fraudulent past, and invest in low-grade, speculative CMBS investments;

4.   The above-mentioned Defendants improperly labeled up front development fees as "Revenue" on the NRIA Fund's financial statements creating an inaccurate representation of the NRIA Fund's finances success;

5.   Demand for the NRIA Fund's development projects was artificially inflated with the creation of "straw purchasers" to purchase the NRIA Fund's properties;

6.   The NRIA Fund was actually unable to pay investors their owed distribution payments; and

7.  Plaintiffs and Class Members were unaware that membership units in the NRIA
Fund were being sold and solicited by unregistered individuals acting as brokers
on behalf of NRIA and the NRIA Fund.

160.  As a proximate result of the above-mentioned Defendants' fraudulent and negligent
misrepresentations, Plaintiffs and Class Members have suffered substantial harm.

## COUNT VI

### Unjust Enrichment Under New Jersey State Law
### Against All Defendants

161.  Plaintiffs repeat and re-allege each and every allegation contained above as if
fully set forth herein.

162.  As set forth above, Defendants have engaged in improper, unlawful, and/or unjust
acts, all to the harm and detriment of Plaintiffs and Class Members.

163.  When Plaintiffs and Class Members invested in the NRIA Fund, through the
NRIA Salespersons, they reasonably believed that the Defendants were acting in good faith in
furtherance of legitimate transactions.

164.  Instead, Defendants acted improperly, unjustly, and unlawfully, taking Plaintiffs'
and Class Members' money for their personal and family's benefit.

165.  All of the Defendants have been enriched at Plaintiffs' and Class Members'
expense through their investment into the NRIA Fund.

166.  Defendants' retention of Plaintiffs' and Class Members' funds violates
fundamental principles of justice, equity, and good conscience. Therefore, retention of that
benefit without repayment would be unjust.

167.  As a proximate result of Defendants' unjust retention of Plaintiffs' and Class
Members' funds, Plaintiffs and Class Members have suffered substantial harm.

44

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, individually and on behalf of the Class, demand judgment as follows:

1.      Determining that the instant action may be maintained as a class action under Federal Rules of Civil Procedure 23 and certifying Plaintiffs as the Class representatives;

2.      Requiring Defendants to pay compensatory damages jointly and severally in favor of the Plaintiffs and the Class for all damages sustained by reason of the acts and transactions alleged herein;

3.      Awarding Plaintiffs and Class Members recission, disgorgement, and all other remedies in equity or in law pursuant to the Securities Act;

4.      Awarding Plaintiffs and Class Members prejudgment and post-judgment interests, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

5.      Awarding such further relief as the Court deems just and proper.

DATED: January 5, 2023                    Respectfully Submitted,

Gary S. Graifman
**KANTROWITZ GOLDHAMER &**
**GRAIFMAN, P.C.**
135 Chestnut Ridge Road, Suite 200
Montvale, New Jersey 07645
(201) 391-7000
ggraifman@kgglaw.com


William B. Federman*
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, Oklahoma 73120
P: (405) 235-1560 F:(405) 239-2112
Email: wbf@federmanlaw.com

*pro hac vice application forthcoming*